**TEXAS MUT. LIFE INS. ASS'N v. BURNS et ux.**

**No. 1720.**

Court of Civil Appeals of Texas. Waco.
March 12, 1936.

Rehearing Denied April 2, 1936.

Richey, Sheehy & Teeling, of Waco, for appellant.

Davidson, Randall & Gray, of Dallas, and McClellan, Lincoln & Williams, of Waco, for appellees.

ALEXANDER, Justice.

Ernest Roy Burns and his wife sued the Texas Mutual Life Insurance Association, and alleged, in substance, that on December 30, 1927, the defendant issued and delivered to plaintiffs a mutual assessment insurance certificate in the sum of $5,000, payable to Mrs. Burns as beneficiary upon the death of Mr. Burns; and that, notwithstanding the plaintiffs had paid all dues and assessments and had fully performed their part of the contract, the defendant, on or about June, 1933, asserted that the policy had lapsed for failure to pay an assessment, repudiated the contract, and refused to be bound thereby. Plaintiffs sued to recover the sum of $5,000, less such premiums as would be necessary to keep the policy in force during the remainder of the life of the insured. A trial before a jury resulted in a verdict and judgment for plaintiffs in the sum of $4,892. The defendant appealed.

By a group of propositions the appellant assails the sufficiency of the evidence to support the verdict. The policy in question was a mutual assessment certificate. It bound the insured to pay certain annual dues and the sum of $5.50 upon the death of any member in the designated class within ten days from date of notice of a death assessment. Failure to pay such assessment forfeited the certificate. It further provided that in giving notice of any assessment it should not be necessary for the association to do more than mail a written notice properly stamped and addressed to such member at the last ad-

dress as furnished by the member. The association contended that the policy lapsed because of the failure to pay an assessment of $5.50 duly levied on the death of one Floyd Matthews, a member of the same class. It was claimed that notice of said assessment was duly mailed to the insured on May 19, 1933, and again on May 26, 1933, and that, upon the insured's failure to pay the assessment within the stipulated time, all benefits under the certificate were forfeited. There was no dispute about the assessment having been duly and regularly levied. The insured did not claim to have paid the assessment, but contended that no such notice was ever sent to him. The jury found that the notices were never mailed to the insured, and it is on this finding that the appellant assails the insufficiency of the evidence.

The association introduced the testimony of the various employees in its office by which it was shown how the mailing list was regularly made up and the notices sent out for each assessment. The notices were addressed on an automatic addressograph machine. The machine worked by running metal plates through it, which plates printed the name and address of each of the members in the class against which the assessment had been levied. It automatically addressed one envelope to each of the members whose name appeared on one of the metal plates. After the envelopes were addressed, they were checked back against the card file containing a list of the members in that class and were later rechecked against another similar list. After the letters were addressed, they were stamped and sealed and carried to the post office and mailed. After a seven-day period, similar notices marked "second notice" were sent to those of the class who did not respond to the first notice. The second notices were sent out in the same way as the first, except that, after the envelopes were addressed, there was printed from the addressograph machine a list of the names and addresses of those to whom the notices were to be sent, which list was carried to the post office along with the notices for the purpose of having the postal clerk check the list against the items mailed. Upon delivery of the letters to the postal clerk, he checked the items mailed against the list so furnished him, and, for a fee of one cent per letter evidenced by postage stamps duly canceled, gave the company a receipt for the notices so mailed. While appellant's employees did not profess to have any independent knowledge about this particular assessment, all of them vouched for the accuracy of the system so employed, and testified that, so far as they knew, each of the notices hereinabove referred to were sent out in the regular way and that the name of the insured was included in each of such mailing lists. It appears that the notices were on printed cards, sent out in unsealed envelopes as third-class mail.

The postal clerk testified that on May 26, 1933, he duly checked the mailing list containing the name and address of the insured, which was introduced in evidence, against the items delivered to him at the post office by the association, and that he checked the name of the insured as one of the parties to whom one of such notices was duly mailed. He testified that he did not examine the inside of any of the letters to ascertain what they contained, and that he had no independent recollection about this particular transaction and could not say whether or not the particular letter addressed to the insured had a stamp on it, but that, if such letter had not been tendered to him for mailing, he would not have so certified in the receipt, and that, if it had not contained a suitable stamp, it would have been returned for postage later. On cross-examination this witness testified that the receipt signed by him and introduced in evidence showed that on the occasion in question the association had tendered to the post office department for mailing 1,151 letters; that he had no independent recollection of this particular transaction, but that, usually where letters were tendered and receipt requested, an employee of the association would call off the name on each letter and witness would check the name on the list set out in the receipt tendered for his signature, and that he would then sign and deliver the receipt without ever examining the letters to see whether they were properly stamped or addressed; that the receipt offered in evidence showed that he had checked the name of Ernest Roy Burns as one of the parties to whom one of said letters was addressed; that he did not handle any of the letters nor inspect them to see whether they were properly stamped or addressed; and that he had no way of knowing whether or

not there was a stamp on the letter supposed to have been addressed to Ernest Roy Burns.

On the other hand, appellees introduced the testimony of Mrs. Burns and her brother, E. M. Bates, to prove that no such notice was ever received by the insured. The insured and his wife lived at Hamlin, where they operated a small hotel. At the time of the trial Mr. Burns, who was 58 years of age, was ill with a serious disease and was unable to attend court. Mrs. Burns testified that for some time prior to May, 1933, and continuously since that time, her husband had been in poor health and unable to attend to business, but that at times he had worked around the hotel and had done some gardening eight or ten blocks away from the hotel; that during the time in question all mail addressed to them was deposited in their combination lockbox at the post office, and that either she or her brother, E. M. Bates, took the mail from said box to the hotel about one and a half blocks away where it was distributed; that it was the custom for all notices of insurance assessments to be delivered to and paid by her. She denied having received either of the notices in question, and asserted that she never knew of the assessment in question until she received notice of lapsation on June 8, 1933, with a blank application for reinstatement. She immediately mailed to the association a check for the amount of said assessment, but the payment was refused and an application of reinstatement was later rejected because the insured, on account of ill health, was no longer insurable.

Mrs. Burns' brother, E. M. Bates, testified that he worked at the hotel at night and that he usually got the mail at the post office in the morning. It was his custom and practice to take the mail to the hotel for distribution. He testified that he delivered to Mrs. Burns all notices and assessments on insurance policies and all other mail from insurance companies and other business concerns, and that he had no recollection whatever of having ever received either of the two notices claimed to have been sent by the association during the month of May.

The appellees also introduced the testimony of an expert who was experienced in the operation of an automatic addressograph machine such as was used by appellant. He testified that said machines would sometimes skip or omit a name even though the name plate was properly deposited therein, and he further testified that in stamping and mailing out a large amount of mail such as was handled by the appellant it sometimes happened that the stamps would not be properly fastened to the letter, and as a consequence they would be lost and the letter never delivered, and that some times two of the letters would become stuck together so that both of them would go to one address.

While the evidence introduced by appellant is rather convincing and tends strongly to prove that the notices in question were actually mailed, we are inclined to the view that the testimony introduced by appellees was sufficient to raise an issue of fact to be decided by the jury. The association was obligated not only to mail the notice to the proper address, but to see to it that the letter was properly stamped. All of the witnesses offered by appellant, except the postal clerk, were its regular employees, and therefore interested witnesses. The postal clerk did not examine the letters for postage and could not say whether or not they were properly stamped. The fact that the letters were sent by third-class mail was calculated to invoke less care on the part of the postal department to return the letters for postage in the event of the necessity to do so, and the fact that the letters were not returned to the association furnishes but little assurance that they were properly stamped when delivered to the post office. Mr. and Mrs. Burns' good faith in denying that they received the notices is evidenced by their conduct both before and after the date of the alleged assessment. They had been paying the assessments on the policy in question for approximately six years. They had made prompt payment of an assessment on May 4th, which was only two weeks prior to the date of the alleged assessment. They knew that Mr. Burns was afflicted with a disease from which he could not recover, and were earnestly endeavoring to keep the insurance in force. Immediately upon receipt of notice from the association on June 8th of lapsation of the policy for failure to pay the assessment of May 19th, Mrs. Burns denied having received the notices, and promptly forwarded to the company a check to cover the amount of the assessment. Both Mrs. Burns and her brother, Bates, testified

positively that they received all of the mail that came to the post office at Hamlin addressed to either Mr. or Mrs. Burns, and that all notices of assessments from insurance companies were delivered to Mrs. Burns. She testified positively that she never received either of the notices. It is therefore satisfactorily established, at least sufficiently to raise an issue for the jury, that appellees did not receive notice of the assessment. It has frequently been held that, in view of the usual efficiency of the United States Postal Department, proof that a notice claimed to have been sent through the mail was not received by the addressee is sufficient to raise an issue for the jury as to whether the notice was actually mailed and properly stamped. 24 Tex.Jur. 881; 14 R.C.L. 985; State Division, Lone Star Ins. Union, v. Blassengame (Tex.Civ.App.) 162 S.W. 6; Winters Mutual Aid Ass'n, v. Corum (Tex.Civ.App.) 297 S.W. 238; Cisco Mutual Life Ins. Ass'n v. Ferguson (Tex.Civ.App.) 8 S.W.(2d) 546; Wichita Home Ins. Co. v. Montgomery (Tex.Civ.App.) 4 S.W.(2d) 1041; Texas Mutual Life Ins. Ass'n v. Adams (Tex.Civ.App.) 77 S.W.(2d) 581.

■■ Appellant's next contention is that the trial court erred in placing on it the burden of proving that notice of the assessment in question was properly mailed. Its contention in this respect is that the appellees, having sued to recover damages for the anticipatory breach or the alleged unlawful repudiation of the contract before its maturity were under obligation, not only to prove that appellant repudiated the contract, but that it did so unlawfully, and that this required appellees to prove that they had paid all assessments for which notices had been mailed, and, since they admitted that they had not paid the assessment in question, the burden was on them to prove that no such notice had been mailed. We cannot sustain this contention. The policy provided for the payment of annual dues and, in addition, special assessments in a given amount when properly levied and notice given after the death of a member in the same class. The appellees established prima facie their right to recover for the breach by proving that the contract had been entered into; that they had performed all of the regular and certain conditions provided for therein; that the defendant had repudiated its obligation; and that damages had resulted therefrom. No obligation to pay a death assessment arose until the assessment had been levied by the association and notice thereof given in the manner provided for by the policy and by-laws. This was an uncertain event, the happening of which was peculiarly within the knowledge of the insurer, and, if it relied on the happening of such an event for its alleged right to demand the payment of an assessment and to declare a forfeiture for the failure to make same, the burden was on it to allege and prove that such an event had occurred. 32 C.J. 1303, § 534. This required the insurer to prove, not only the levying of the assessment, but that notice thereof had been given as provided in the contract. This is the established rule in Texas where the beneficiary sues to recover on a certificate after the death of the insured. McCorkle v. Texas Benevolent Ass'n, 71 Tex. 149, 8 S.W. 516; State Division, Lone Star Ins. Union, v. Blassengame (Tex. Civ.App.) 162 S.W. 6, par. 4; Winters Mutual Aid Ass'n v. Corum (Tex.Civ. App.) 297 S.W. 238, par. 3; Cisco Mutual Life Ins. Ass'n v. Ferguson (Tex.Civ. App.) 8 S.W.(2d) 546, par. 2; Wichita Home Ins. Co. v. Montgomery (Tex.Civ. App.) 4 S.W.(2d) 1041, par. 2. We see no reason why the same rule should not apply where suit is brought to recover damages for the unlawful breach of a contract during the life of the insured. In each instance the plaintiff pleads the validity of the contract and asserts his right to have all its terms respected and observed, while the insurer asserts that the insured during his lifetime breached the contract by failing to pay a death assessment and thereby forfeited his rights thereunder. We overrule this assignment.

■■ The policy in question provided for the payment to the beneficiary named therein upon the death of the insured the sum of $5 to be collected from each member of said association in good standing in said class, not to exceed a total sum of $5,000, plus all death assessments previously paid by the insured. The jury found that, at the time the contract was repudiated by the association and continuously thereafter, the insured named in the policy was not an insurable risk, and that on account of the condition of his health he had no life expectancy at the time of the trial. The sufficiency of the evidence to support these findings is not challenged. In fact, it was asserted in oral argument by counsel for appellees, and not denied

by the appellant, that the insured died within a few days after the trial. The jury found that the reasonable amount of assessments necessary to keep the policy in force from the date of breach to the death of the insured was the sum of $93.50. The trial court deducted the amount so found, with compound interest at 10 per cent. per annum, from the face of the policy ($5,000), and awarded judgment for the balance of $4,892. The appellant asserts that this was not the proper measure of damages. Its contention is that there was no way to ascertain the amount of damages, because the association was liable to pay only the amount that could be collected from the members in the same class by an assessment at the date of the death of the insured, and there was no way for ascertaining when the insured would die nor the amount that would be yielded by an assessment at that date. We think the date for calculating the amount that an assessment would yield was established in two ways: In the first place, the association by repudiating its contract thereby selected and fixed the date for making the calculation. If that date was not satisfactory to it, a different date should have been selected by it for repudiating its contract. In the second place, the jury found that the insured had no life expectancy at the time of the trial. Consequently, that date could well serve as the approximate date when the assessment would have been run but for the premature breach by the association. The evidence shows without dispute that the class in question had more than one thousand members at the time of the breach of the contract as well as at the time of the trial, and that an assessment run on either of said dates would have yielded more than $5,000. Ordinarily, the proper measure of damages in such cases is the present value of the policy, less premiums accrued and to accrue during the period of life expectancy, with compound interest at a reasonable rate. Grand Fraternity v. Nicosia (Tex. Civ.App.) 41 S.W.(2d) 684, and authorities there cited. This is the measure of damages applied by the trial court in this case. It may be that under the peculiar terms of this contract the appellees were not required to deduct the amount of unpaid death assessments, and that the rate of interest used in compounding the interest on the unpaid death assessments was too high; but these are matters of which the appellant cannot complain.

▮ Lastly, the appellant contends that it is a mutual assessment association; that all of the funds received by it are those received from its members from death assessments, and that such funds must be held in trust by it for the purpose of paying death benefits, and consequently it has no way of raising money with which to pay damages for breach of its contracts. We are not here concerned with the problem of how the money is to be raised with which to pay the judgment. Those are matters that rest on the shoulders of the directors of the association. Surely such associations cannot repudiate their contracts at will and escape responsibility for damages. We assume that the officers of the association will find a way to meet the obligation when liability therefor is once definitely established.

The judgment of the trial court is affirmed.